## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| | ) | |
| NEWSTARCOM HOLDINGS, INC., et al. | ) | Case No. 08-10108 (CSS) |
| | ) | Jointly Administered |
| Debtors. | ) | |
| _____ | ) | |
| GEORGE L. MILLER, as Chapter 7 Trustee | ) | |
| Of the Estates of NewStarcom Holdings, | ) | |
| Inc., et al., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adv. No. 10-50063 (CSS) |
| | ) | |
| AMERICAN CAPITAL, LTD., STEVEN | ) | |
| PRICE, GORDON O'BRIEN, MARK | ) | |
| FIKSE, CRAIG MOORE, MATCO | ) | |
| ELECTRIC CORP. f/k/a Matco Associates | ) | |
| Inc., RONALD BARBER, MARK FREIJI, | ) | |
| and KENNETH ELLIOTT | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION

FLASTER GREENBERG
William J. Burnett
913 North Market Street
Suite 1001
Wilmington, DE 19801

    -and-

KAUFMAN, COREN & RESS, P.C.
Steven M. Coren
Douglas Evan Ress
Two Commerce, Suite 3900
2001 Market Street
Philadelphia, PA 19103

ASHBY & GEDDES, P.A.
Benjamin W. Keenan
500 Delaware Avenue
8th Floor
Wilmington, DE 19899

    -and-

HINMAN, HOWARD &
KATTELL, LLP
Amy Shapiro
700 Security Mutual Building
80 Exchange Street
P.O. Box 5250
Binghamton, New York 13902-5250

Counsel for George L. Miller,
As Chapter 7 Trustee for the
Estates of Newstarcom
Holdings, Inc., et al.

Counsel for Matco Electric Corporation
Ronald Barber, Mark Freije and Kenneth
Elliott

Dated:  August 6, 2014

Sontchi, J._____

## INTRODUCTION

Before the Court is a Motion to Compel, filed by a Chapter 7 trustee against the defendants in accordance with a Request for Production of Documents.  The defendants have objected to producing the requested financial documents on the grounds that the request is irrelevant, overly broad, and unduly burdensome.

For the reasons that follow, the Motion to Compel will be denied.

## JURISDICTION

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), and this Court has the judicial power to enter a final order.

## STATEMENT OF FACTS

1. **Factual History**

The Debtors filed voluntary petitions under Chapter 7 of Bankruptcy Code on January 14, 2008.[1]  Prior to the bankruptcy filing, the Debtors were a holding company

---

[1] Del. Bankr. 08-10108, D.I. 1.

with three electrical contractors as subsidiaries: Port City Electric Company, Constar International, and Matco Electric Corporation ("Old Matco").[2]   Port City Electric Company and Constar International were both closed in October 2007, and Old Matco also faced the risk of closure at that time if not sold quickly.[3]  An immediate fire sale of Old Matco was thus completed in late 2007 to Ronald Barber, Mark Freije, and Kenneth Elliott, former officers of Old Matco, at a price of $2 million.[4]

On January 12, 2010, the Trustee ("Trustee" or "Plaintiff") commenced this adversary proceeding seeking to recover, *inter alia*, damages arising out of the prepetition transfer of Old Matco to company insiders.[5]   The true value of the subsidiary is alleged to have exceeded $15 million at the time of the sale,[6] and by selling the company to insiders for substantially less than free market value, the Trustee alleges that fiduciary duties owed to Old Matco were breached.[7]

By an order dated January 5, 2010, the Court approved the parties' Stipulated Protective Order, allowing the parties to file Confidential Material, and Highly Confidential Material, under seal without filing a separate motion to that effect.[8]

---

[2] Adv. Pro. 10-50063, D.I. 122, p. 2.  All further references made will be to the docket of this adversary proceeding, unless otherwise stated

[3] *Id.*, p. 3.

[4] D.I. 42, ¶¶ 33-34, 61.

[5] Complaint, D.I. 1. The buyers' new company is hereinafter referred to as "New Matco."

[6] D.I. 117, Exh. 3, p. 2.

[7] *Id.*  While the original Complaint included other causes of action, such as transfer avoidance and corporate waste, *see* D.I. 42, such counts were dismissed pursuant to an Order granting in part and denying in part a Motion to Dismiss, *see* D.I. 71.

[8] D.I. 394. The terms "Confidential Material" and "Highly Confidential Material" are defined within the Order.

Separately, pursuant to a stipulation made by the parties on September 16, 2013, all factual discovery was to be completed by March 13, 2014.[9]

The Trustee served the New Matco Defendants,[10] whom this motion is against, with its First Request for Production of Documents on October 31, 2012.[11]  This request asked that the New Matco Defendants:

> "Identify and produce New Matco's tax returns, financial statements, profit and loss statements, balance sheets, appraisals, valuations, and all other documents that show its profits, losses, assets, and/or liabilities for the period November 9, 2007 to present."[12]

In response, the New Matco Defendants objected on the following grounds:

> "… to the extent that it requests documents from the post-petition period, it is overly broad, unduly burdensome, is not reasonably limited by date, and seeks information that is not relevant and is unlikely to lead to admissible evidence."[13]

It is alleged that the Trustee then offered to accept financial information through the end of 2012 only, rather than from November 9, 2007 to the present, but that this offer was not taken.[14]  A following offer was made to reduce that time period further,

---

[9] D.I. 117, Exh. 3, p. 3.

[10] The Defendants in this adversary proceeding are often referred to in two separate categories: New Matco Defendants, and ACAS Defendants.  The "New Matco Defendants" consist of Matco Electric Corporation, as well as Ronald Barber, Mark Freije, and Kenneth Elliott, officers who acquired Old Matco.  *See id.*, Exh. 3, p. 1 n. 2.  The "ACAS Defendants" consist of American Capital, Ltd. ("ACAS"), a publicly traded private equity firm that acquired and managed companies such as NewStarcom, as well as Steven Price, Gordon O'Brien, Mark Fikse, and Craig Moore, officers and high-level employees of ACAS who served on and controlled various boards of the Debtors.  *See id.*, Exh. 3, p. 2 n. 3.

[11] D.I. 86.

[12] D.I. 117, Exh. A, p. 8.

[13] *Id.*

[14] D.I. 117, ¶¶ 5-6.

asking for such information only through the end of 2011, with a corresponding reassurance that the information was "sought only for purposes of the litigation and is not sought in the nature of pre-judgment asset discovery."[15]   The New Matco Defendants maintained their objection.[16]

### 2. Procedural Posture and Arguments

In seeking the Motion to Compel, the Trustee argues that the requested financial information is relevant, and that the New Matco Defendants' objections are baseless. Citing cases from the Third Circuit and the Tax Court, Plaintiff opines that post-sale financial information is relevant toward determining the reasonableness of any valuation of a business or an asset on its sale date.[17]   Plaintiff also argues that the objections made, based on over-breadth and undue burden, are baseless, as the New Matco Defendants have not explained why the Trustee's request has been burdensome, nor have the New Matco Defendants proposed alternatives to enable some degree of production.[18]   Plaintiff characterizes these documents as "readily available," and point out that the New Matco Defendants have "rebuffed the Trustee's repeated accommodation proposals" which would have mitigated any perceived burden.[19]

---

[15] *Id.  See also* Exh. B.

[16] D.I. 117, Exh. 3, p. 6.  *See also* D.I. 122, Opposition to Plaintiff's Motion to Compel, p. 3.

[17] D.I. 117, Exh. 3, pp. 6-9.  The facts provided speak to at least one internal valuation which has been performed.  *Id.* at p. 3 ("Under the ACAS Defendants' internal fire sale valuation, Old Matco could be sold for a price between $5.6 million and $15.4 million.").   Additional valuations may have been conducted, and the Court will presume that Plaintiff already possesses this relevant information.

[18] *Id.*, pp. 9-10.

[19] *Id.*, p. 10.

In opposition, the New Matco Defendants argue that the discovery sought is irrelevant to whether New Matco Defendants were fiduciaries, and that the Trustee has not sustained its burden in showing why the documents sought are relevant to the remaining claims.[20]   The New Matco Defendants first assert that in order to show a breach of fiduciary duties, it must be shown that the defendants owed fiduciary duties. They opine that the financial condition of New Matco after the asset purchase is "utterly irrelevant" to the question of whether such duties were owed.[21]   Second, the New Matco Defendants distinguish or discredit many of the authorities cited by the Trustee in its Motion, arguing that the examination of post-transaction performance is not a "recognized method of proving value absent evidence of obstacles to the use of other acceptable methods of value."[22]   Instead, the New Matco Defendants argue that Old Matco's value stemmed from its backlog of jobs, but before such jobs can be considered in valuation, these future prospects must be "known or susceptible of proof as of the date of the transaction."[23]   The New Matco Defendants assert that because a closing of Old Matco was already planned to occur shortly before the date of the sale, no such jobs or future prospects were known or susceptible to proof, rendering the $15m alleged value incorrect.[24]   In the alternative, the New Matco Defendants plead that discovery

---

[20] D.I. 122, pp. 4-10.

[21] *Id.*, pp. 4-5.

[22] *Id.*, pp. 9-10.

[23] *Id.*, p. 10.

[24] *Id.*, p. 10.

should be limited to one year after the sale, to December 31, 2008.[25]  If future prospects are deemed as valid considerations within the valuation analysis, the New Matco Defendants argue that such prospects would not be able to affect the valuation for more than a year after the sale, and certainly not until 2011.[26]

The Trustee filed a response brief under seal which reaffirmed and clarified its original arguments: that the Trustee seeks the financial information on the basis that it is "among the body of information which . . .  valuation experts in this case wish to review and consider,"[27] in order to compare and assess the reasonableness of valuations of the company which were conducted in the months leading up to the sale of Old Matco.[28]

## DISCUSSION

The New Matco Defendants have objected to the discovery request on the following grounds: (1) relevance; (2) over-breadth and undue burden; and (3) that the information is not reasonably limited by date.  The relevance of the information sought will be examined first.

---

[25] *Id.*, p. 11.  The sale occurred on December 20, 2007. The New Matco Defendants submit that discovery should be limited to a year after the sale, but for convenience and to reflect general accounting practice, they have extended this to December 31, 2008, rather than December 20, 2008.  *Id.*

[26] *Id.*, pp. 11-12.

[27] D.I. 117, ¶ 9.

[28] *See* D.I. 117, Exh. 3, p. 9.

1. **Legal Standard**

Under the Federal Rule of Civil Procedure 26(b)(1),[29] parties can obtain discovery on any nonprivileged matters "relevant to any party's claim or defense" which is "reasonably calculated to lead to the discovery of admissible evidence."  Construed as a broad standard,[30] discovery is ordinarily allowed under the concept of relevancy "unless it is clear that the information sought can have no possible bearing upon the subject matter of the action."[31]  Yet while a plaintiff can adduce evidence "in support of cognizable claims set out in [the] complaint," a plaintiff is not entitled to discovery "for the purpose of determining whether or not there may be a factual basis for a claim . . . not [yet] made."[32]

Once an objection has been raised as to relevancy, the party seeking the discovery bears the burden of demonstrating the relevance of the sought information to the claims, defenses, or the subject matter of the litigation.[33]

---

[29] Fed. R. Civ. P. 26 is made applicable in adversarial proceedings under Fed. R. Bankr. P. 7026.

[30] *Pacitti v. Macy's*, 193 F.3d 766, 777 (3d Cir. 1999) ("It is well recognized that the federal rules allow broad and liberal discovery.") (citing *In re Madden*, 151 F.3d 125, 128 (3d Cir. 1998)).

[31] *In re ML-Lee Acquisition Fund II, L.P.*, 151 F.R.D. 37, 39 (D. Del. 1993) (quoting *La Chemise Lacoste v. Alligator Co., Inc.*, 60 F.R.D. 164, 171 (D. Del. 1973)).

[32] *McLaughlin v. Copeland*, 455 F. Supp. 749, 753 (D. Del. 1978), *aff'd*, 595 F.2d 1213 (3d Cir. 1979).  *See also In re ML-Lee Acquisition*, 151 F.R.D. at 41 ("While most discovery involves some 'fishing', as with actual fishing, the hook must first be appropriately baited.").

[33] *Inventio AG v. ThyssenKrupp Elevator Americas Corp.*, 662 F. Supp. 2d 375, 381 (D. Del. 2009).

## 2. The Subject Matter of the Litigation

Pursuant to the Order issued on July 5, 2012, which granted in part and denied in part a Motion to Dismiss, the only causes of action which remain standing against the defendants in this adversary proceeding are breaches of fiduciary duty, and aiding and abetting breaches of fiduciary duty, with respect to the sale of Old Matco's assets.[34]

### a. Breaches of Fiduciary Duty

In adjudicating breaches of fiduciary duty, the business judgment rule serves as Delaware's default standard of review.[35]  The rule establishes a presumption in favor of the directors, and presumes that "in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company."[36]  In particular, when dealing with a sale of corporate assets, this rule has not only been reaffirmed but also broadened: "[D]irectors enjoy a presumption of honesty and good faith with respect to

---

[34] *See* D.I. 71.

[35] *Carsanaro v. Bloodhound Technologies, Inc.*, 65 A.3d 618, 637 (Del. Ch. 2013).  More detail can be found in *Reis v. Hazelett Strip–Casting Corp.*, 28 A.3d 442, 457 (Del. Ch. 2011) ("When determining whether corporate fiduciaries have breached their duties, Delaware corporate law distinguishes between the standard of conduct and the standard of review.  The standard of conduct describes what directors are expected to do and is defined by the content of the duties of loyalty and care.  The standard of review is the test that a court applies when evaluating whether directors have met the standard of conduct.  Delaware has three tiers of review for evaluating director decision-making: the business judgment rule, enhanced scrutiny, and entire fairness.") (internal quotations and citations omitted).

[36] *Carsanaro*, 65 A.3d at 637 (quoting *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984)).

negotiating and approving a transaction involving a sale of assets,"[37] as long as they are properly informed.

To rebut these presumptions, a plaintiff assumes the burden of proving "that directors, in reaching their challenged decision, breached any one of the triads of their fiduciary duty—good faith, loyalty or due care."[38]  If successfully rebutted, the burden shifts, and the directors must establish to the court's satisfaction that the transaction was the product of both fair dealing and fair price.[39]  The fairness of a price for selling assets must be judged in light of the conditions existing at the time of sale, disregarding subsequent events.[40]

When a sale of the company is at issue, an enhanced level of scrutiny is also utilized by the courts: a judicial determination regarding the adequacy of the decision-making process employed by the directors, including the information on which the directors based their decision; and a judicial examination of the reasonableness of the directors' action in light of the circumstances then existing.[41]  While a board of directors

---

[37] *In re Bridgeport Holdings, Inc.*, 388 B.R. 548, 567 (Bankr. D. Del. 2008) (quoting 1 R.F. Balotti & J.A. Finkelstein, The Delaware Law of Corporations and Business Organizations, § 10.6[A], (3d ed. 2007)).  *See also Gimbel v. Signal Companies, Inc.*, 316 A.2d 599, 609 (Del. Ch. 1974), *aff'd*, 316 A.2d 619 (Del. 1974); *In re Novell, Inc. S'holder Litig.*, No. 6032-VCN, 38 Del. J. Corp. L. 279, 2013 WL 322560, at *15 (Del. Ch. Jan. 3, 2013) ("This presumption is an important aspect of Delaware's business judgment rule, and provides directors with a wide ambit of business judgment in fixing the terms and conditions of a sale of assets.")

[38] *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 361 (Del. 1993), *decision modified upon reargument on other matters*, 636 A.2d 956 (Del. 1994).

[39] *Id.* (citing *Nixon v. Blackwell*, 626 A.2d 1366, 1376 (Del. 1993); *Weinberger v. UOP, Inc.*, 457 A.2d 701, 711 (Del. 1983)).

[40] *McPadden v. Sidhu*, 964 A.2d 1262, 1272 n. 24 (Del. Ch. 2008) (quoting *Marks v. Wolfson*, 188 A.2d 680, 686 (Del. Ch. 1963)).

[41] *In re Pennaco Energy, Inc.*, 787 A.2d 691, 705 (Del. Ch. 2001).

may rely in good faith upon information, opinions, reports or statements presented by corporate officers, employees and experts selected with reasonable care, "it may not avoid its active and direct duty of oversight . . . in the sale of corporate control. That would seem particularly obvious where insiders are among the bidders."[42]

There is no single blueprint that a board must follow in order to fulfill its duties,[43] nor is every disparity of price and value conclusive of a breach of such duties. "The disparity must be sufficiently great to indicate that it arises not so much from an honest mistake in judgment concerning the value of the assets, as from either improper motives underlying the judgment of those in whom the right to judge is vested or a reckless indifference to or a deliberate disregard of the interests" of those who do not have decisive power in the situation.[44] At the same time, however, the fact that a sale was made at market price does not establish as a matter of law that there was no breach.[45]

### b. Aiding and Abetting Breaches of Fiduciary Duty

The four elements of an aiding and abetting claim are as follows: (1) the existence of a fiduciary relationship; (2) a breach of the fiduciary's duty; (3) knowing participation

---

[42] *Mills Acquisition Co. v. Macmillan, Inc.*, 559 A.2d 1261, 1281 (Del. 1989).

[43] *Barkan v. Amsted Indus., Inc.*, 567 A.2d 1279, 1286 (Del. 1989); *Lyondell Chem. Co. v. Ryan*, 970 A.2d 235, 242 (Del. 2009) ("No court can tell directors exactly how to accomplish th[e] goal [of receiving the best price for their shareholders], because they will be facing a unique combination of circumstances, many of which will be outside their control.")

[44] *Marks*, 188 A.2d at 686 n. 6 (Del. Ch. 1963) (quoting *Allaun v. Consol. Oil Co.*, 147 A. 257, 261 (Del. Ch. 1929)).

[45] *Penn Mart Realty Co. v. Becker*, 298 A.2d 349, 352 (Del. Ch. 1972).

in that breach by the defendants; and (4) damages proximately caused by the breach.[46]
In particular, "[k]nowing participation in a board's fiduciary breach requires that the
third party act with the knowledge that the conduct advocated or assisted constitutes
such a breach."[47]

### 3.  The Relevance of Post-Sale Financial Information

In support of its Motion to Compel, Plaintiff argues that post-sale financial
information is relevant toward determining the reasonableness of any valuation of a
business or asset as of the sale date.  Plaintiff states that "subsequent events which
provide evidence of the value of the property on the valuation date can be taken into
account, and used by valuators and [c]ourts as confirmatory data to a valuation."[48]

To begin, the Court first makes several observations and presumptions based on
the presently available facts.  Plaintiff provides information regarding at least one
internal valuation which has been performed, and it remains possible that others were
also made.  Valuation methodology comes in varying forms, including asset valuations,
discounted cash flow valuations, or comparable-transactions valuations.  As Plaintiff is
requesting for New Matco's post-sale financial statements, it appears likely that Plaintiff
is seeking to compare the actual cash flow of the subsidiary post-sale, with the
predicted cash flow used to form a discounted cash flow valuation.  On the other hand,

---

[46] *Malpiede v. Townson*, 780 A.2d 1075, 1096 (Del. 2001); *Jackson Nat. Life Ins. Co. v. Kennedy,* 741 A.2d 377, 386 (Del. Ch. 1999).

[47] *Malpiede,* 780 A.2d at 1097.

[48] D.I. 117, Exh. 3, p. 6.

though this argument is not briefed in a detailed manner, the New Matco Defendants most likely believe that such financial information is wholly irrelevant because it does not aid in deciding whether the decision to sell New Matco at the sale price of $2m was reasonable at the time of the sale. Instead, that determination should be reached by examining the decision-making process, and what information was available at that point in time, rather than how the company actually turned out in the future.

Plaintiff cites a variety of cases in support of its proposition that confirmatory data has often been used by courts.[49] First, Plaintiff cites to *VFB LLC v. Campbell Soup Co.,*[50] arguing that the Third Circuit affirmed a district court's use of a spun-off company's market capitalization, as of a date nine months after the spin-off, to conclude that the price paid nine months earlier was "reasonably equivalent value."[51] In actuality, however, the Third Circuit affirmed this use because it appeared that investors at the time of the spin-off may have been misled by the manipulation of sales

---

[49] Plaintiff cites to a variety of sources which are not on point or directly related to determining the issue at hand. Plaintiff's quote from *Bondholders, Inc. v. Powell,* 342 U.S. 921 (1952) stemmed from dicta in connection with a denial of the petition for writ of certiorari, with several key distinguishing facts – including the fact that despite intensive study by experts, valuations in the industry were often turning up incorrect, possibly due to improper standardized methodology. Two of Plaintiff's cited tax court cases, *Estate of Noble v. C.I.R.,* T.C.M. (RIA) 2005-002 (T.C. 2005) and *Morton v. C.I.R.,* 73 T.C.M. (CCH) 2520 (T.C. 1997), as well as its inaccurately quoted Pratt treatise (Shannon P. Pratt, et al., *Valuing a Business* (4th ed. 2000) at 672), do not discuss the use of actual data to confirm **forecasts or projections** and thus cannot be seen as relevant to the issue at hand. Finally, the last tax court authority cited by Plaintiff, *Estate of Jung v. C.I.R.,* 101 T.C. 412 (1993) is also inapplicable, as the quoted section merely comments on a form of "comparable transactions analysis" used in creating a valuation.

[50] 482 F.3d 624 (3d Cir. 2007).

[51] "Reasonably equivalent value" is a specific term utilized in New Jersey's version of the Uniform Fraudulent Transfer Act. The court in *VFB* adopts a "common-sense" approach to defining this term. "[R]easonably equivalent value is not an esoteric concept: a party receives reasonably equivalent value for what it gives up if it gets 'roughly the value it gave.' " *VFB,* 482 F.3d at 631 (citing two Third Circuit cases).

and earnings data prior to the spin.[52]  For this reason, the Court could not rely on VFI's market capitalization at the time of the spin to determine whether reasonably equivalent value had been paid at the time of the spin.  Yet no such similar manipulation has been alleged here.  The case is also easily distinguishable as Old Matco is not a publicly traded company.  The contested valuation in this case is not based on market capitalization, which can be affected by public information (such as manipulated financial data) being impounded into the stock price.  Instead, it is relevant that *VFB* states the following: "A company's actual subsequent performance is something to consider when determining *ex post* the reasonableness of a valuation, but it is not, by definition, the basis of a substitute benchmark."[53]

Second, Plaintiff cites to *Moody v. Sec. Pac. Bus. Credit, Inc.*,[54] arguing that the Third Circuit examined actual performance after a leveraged buyout transaction to determine whether the district court's finding – regarding whether projections relied on were reasonable - was in itself reasonable.  The Third Circuit examined this matter under a "clearly erroneous" standard of deference to the district court.[55]  Within *Moody,* the Third Circuit determined that although month-by-month cash flow projections of the company after the leveraged buyout were not made, extensive analysis had still been performed, and the district court thus had not erred in finding the projections

---

[52] *Id.* at 631-2.

[53] *VFB*, 482 F.3d at 631 (internal citations omitted).

[54] 971 F.2d 1056, 1064 (3d Cir. 1992).

[55] *Id.* at 1063.

reasonable.[56]  As an afterthought, the court noted that the "conclusion [it reached] is bolstered by the fact that during the five months following the leveraged buyout, [the actual] cash flow tracked the projections" which had been relied upon.[57]  Similarly, the court in *In re Genesis Health Ventures, Inc.*[58] noted that "[t]he fact that the . . . actual results are on target with [the] budget projections . . . confirms the reasonableness of the . . . projections," when evaluating the reasonableness of EBITDA forecasts which had been relied upon.  Finally, the Third Circuit has also observed in dicta that "[a]ctual performance . . . following [a] transaction is evidence of whether the parties' projections were reasonable."[59]

There lies a thin line between using confirmatory data appropriately, as in *Moody* and *Genesis,* and utilizing post-sale financial information to criticize forecasts (and thereby the decisions which relied on them) with the benefit of hindsight.[60]  In a case similar to *Moody's* leveraged buyout, the court declared that it had to "consider the reasonableness of the company's projections, not with hindsight, but with respect to whether they were prudent when made."[61]  Within the realm of forward-looking

---

[56] *Id.* at 1073-4 ("[A]lthough the failure to undertake an independent cash flow analysis will often be unreasonable, we cannot say the district court erred in finding [the] projections reasonable.").

[57] *Id.* at 1074.

[58] 266 B.R. 591, 614 (Bankr. D. Del. 2001).

[59] *In re PWS Holding Corp.*, 228 F.3d 224, 234 (3d Cir. 2000).

[60] *Cf. KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 421 (2007) ("A factfinder should be aware . . . of the distortion caused by hindsight bias and must be cautious of arguments reliant upon ex post reasoning.") (within the context of examining the "prior art" requirement in patent law).

[61] *Fid. Bond & Mortgage Co. v. Brand*, 371 B.R. 708, 723 (E.D. Pa. 2007) (quoting *MFS/Sun Life Trust–High Yield Series v. Van Dusen Airport Srvs. Co.*, 910 F. Supp. 913, 944 (S.D.N.Y. 1995)).

statements under federal securities laws, the Third Circuit has pointed out that the accuracy of projections is only one factor to be considered in determining whether projections made were reasonable.   "The fact that we see in hindsight that [the actual data] did in fact turn out to be roughly within the range they were projected does not tell us conclusively that the forecasts were reasonable *at the time they were made*."[62]

Here, the New Matco Defendants assert that the financial performance of New Matco is irrelevant to the question of whether fiduciary duties were owed, whether they were violated, and the corresponding damages, or whether any violation was aided and abetted.[63]   Yet the Trustee argues that it is entitled to obtain discovery of Defendants' financial information to determine the reasonableness of any valuation of the company as of the sale date.[64]   The Court is not persuaded by the Trustee's argument.   While the balance of law indicates that confirmatory data can be used to determine the accuracy and reasonableness of projections (and therefore also the valuations created using such projections), the reasonableness of such projections is of little to no use within this case. If the projections turn out correct, it may signify that some or all of the valuations performed were reasonable.   If the projections turn out incorrect, the valuations performed may still be reasonable based on the methodology used to perform such valuations and the information relied upon at that time.   Consequently, the accuracy of the projections and valuations provides little information toward determining whether

---

[62] *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1429 n. 16 (3d Cir. 1997) (italics in original).

[63] D.I. 122, Exh. 5.

[64] *See* D.I. 117, Exh. 3, p. 9.

the directors, relying on such valuations, breached their fiduciary duty in proceeding with the sale of the company at a specific price.

It is possible that breaches occurred notwithstanding the reliance of the directors on valuations, which were created based on projections, which turned out to be correct. As the Court of Chancery pointed out in *Penn Mart,* breaches can occur even if sales are made at market price.[65]  To determine if a breach of fiduciary duty has occurred, the Court will need to examine the decision-making process of a sale, rather than the accuracy of a valuation which has been relied upon.  The Court looks at whether the valuations were made by individuals selected with reasonable care, whether the directors had active and direct oversight in the sale process,[66] whether the directors had improper motives,[67] and more.  Valuation continues to be a subjective and uncertain enterprise,[68] and here, any connection between the accuracy of the projections and the cause of action at issue, is too attenuated to be relevant.

The lack of relevance here is enough to dismiss the Motion to Compel entirely. To the extent that other objections have been made by the New Matco Defendants on the grounds of over-breadth, undue burden, and the information not being reasonably

---

[65] *Penn Mart Realty Co. v. Becker*, 298 A.2d 349, 352 (Del. Ch. 1972).

[66] *See Mills Acquisition Co. v. Macmillan, Inc.*, 559 A.2d 1261, 1281 (Del. 1989).

[67] *Marks v. Wolfson*, 188 A.2d 680, 686 (Del. Ch. 1963).

[68] *In re 3Com Shareholders Litig.*, No. 5067-CC, 2009 WL 5173804, at *7 (Del. Ch. Dec. 18, 2009) ("There are limitless opportunities for disagreement on the appropriate valuation methodologies to employ, as well as the appropriate inputs to deploy within those methodologies.") (discussing going-concern valuations).

limited by date, such objections have been rendered moot, and need not be addressed by the Court.

## CONCLUSION

The Trustee has requested post-sale financial information to determine the accuracy, and thus reasonableness, of projections which have been used to create valuations of the company before the sale occurred.  This, however, provides limited assistance in determining the reasonableness of the directors in making the decision to sell the company at a particular price, which is at issue in this case due to the cause of action alleging a breach of fiduciary duties.

The Motion to Compel will be denied.  An order will be issued.